UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

JOHN DOE, III,                          )
                                        )
          Plaintiff,                    )
                                        )         CIVIL ACTION NO.
VS.                                     )
                                        )         3:13-CV-3030-G
KANAKUK MINISTRIES a/k/a and/or         )
KANAKUK KAMP, KANAKUK KAMPS,            )
KANAKUK, KANAKUK-KANAKOMO               )
KAMPS, CHRISTIAN CHILDREN'S             )
CHARITY, KANAKUK ALUMNI                 )
FOUNDATION, ET AL.,                     )
                                        )
          Defendants.                   )


## MEMORANDUM OPINION AND ORDER

Before the court is the amended motion of the defendants Kanakuk Ministries and Kanakuk Heritage, Inc. for partial dismissal of the plaintiff's claims pursuant to Federal Rule of Civil Procedure 12(b)(6) (docket entry 24). For the reasons stated below, the motion is granted in part and denied in part.

## I. BACKGROUND

### A. Factual Background

This case concerns the sexual abuse of the plaintiff by the counselor of a Christian summer camp. The plaintiff, John Doe III ("Doe"), was sexually abused for

several years by the defendant Peter Newman ("Newman"), a camp counselor at

Kanakuk Kamps, the summer camp operated by the defendants Kanakuk Ministries

and Kanakuk Heritage, Inc. (hereinafter collectively referred to as "Kanakuk").

Plaintiff's First Amended Complaint ("Amended Complaint") ¶¶ 4.1-4.2, 4.7 (docket

entry 19).  Doe alleges that this sexual abuse occurred at the summer camp, on

marketing trips promoting the camp, and at Doe's home.  *Id.* ¶¶ 3.5, 3.7, 4.8.  The

abuse consisted of molestation, "all types of sexual activity except kissing," and nude

contact during camp events such as basketball, swimming, and "Bible study."  *Id.* ¶¶

4.7-4.8, 4.14, 4.17, 4.29.  Newman is now in prison, and Kanakuk does not appear

to dispute the fact that he sexually abused campers, at least for the purposes of the

motion to dismiss.  See *id.* ¶ 1.5; Kanakuk Ministries and Kanakuk Heritage, Inc.'s

Memorandum of Law in Support of Their Amended Motion for Partial Dismissal

("Defendants' Brief") at 1, 5-6, 9-10 (docket entry 25).

Doe alleges that Newman was not an ordinary counselor for Kanakuk, but

rather was the "face" of the Kanakuk Kamps and was featured prominently in

Kanakuk's promotional materials.  *See* Amended Complaint ¶ 4.46.  Kankakuk

promoted the Christian nature of its camp with Newman as the model director.  *Id.*

His image was used on the Kanakuk website, in marketing materials and videos

shown at lectures attended by the plaintiff, and in the personal testimonial of the

president of Kanakuk Kamps, who praised Newman's "raging love for God" that

"spills over constantly to the kids at kamp." *Id.* ¶ 4.47.  Doe claims that Kanakuk

promoted the camp as "a safe and loving Christian place" and "a wholesome

environment" where "the Kamps' staff, including . . . Newman, would help minors

further their Christian faith and relationship with God in a safe environment."  See

*id.* ¶ 5.2.

However, as early as 1999, Kanakuk learned that Newman was riding four-

wheelers and swimming in the nude with male campers.  *Id.* ¶ 4.14.  Kanakuk later

learned that Newman also went running and played basketball in the nude with

campers.  *Id.* ¶ 4.17.  Newman's behavior was even acknowledged by his immediate

supervisor, Will Cunningham, who referenced "Newman's one-on-one sleepovers with

boys" in his evaluation of Newman.  *Id.* ¶ 4.16.  Despite that acknowledgment,

Newman was not reported to authorities or fired, but was instead promoted to be the

director of "K-Kountry," a different camp with younger male campers.  *Id.* ¶¶ 4.4,

4.16.  By continuing Newman's employment, the defendants disregarded their own

staff manual, which forbade "any degree of sexual contact" between staff members

and campers, "any evidence of homosexual behavior," and "lay[ing] on a Kamper's

bed day or night."  *Id.* ¶ 4.22.  The manual even explicitly forbade "games of any kind

in the nude."  *Id.*

Because no action was taken against him, Newman's abuse of children was

allowed to continue for approximately ten years.  *Id.* ¶ 5.33.  During that time,

- 3 -

Kanakuk was contacted by a concerned parent whose daughter attended the camp. *Id.* ¶ 4.24.  In 2006, the parent called Kankuk's staff multiple times to report that Newman frequently touched campers inappropriately, including one incident where he touched a boy's upper thigh and genital area.  *Id.*  The defendants dismissed the incident over the phone.  *Id.*  That same year, a father called to complain that Newman was sending text messages and making late night calls to his son.  *Id.* ¶ 4.25. No mention of this complaint was entered into Newman's personnel file, and he remained the director of K-Kountry.  *Id.*  Other entries in Newman's personnel file did hint at the open nature of his inappropriate actions towards male campers.  *See id.* ¶ 4.27.  Evaluations mention that he "is not always thinking of the consequences," is "always with kids," "writes every boy," and "is so focused on the kids he doesn't have time for counselors."  *Id.*

In addition to the contact that Newman had with children at camp, Kanakuk regularly sent Newman and other staffers to stay in the homes of "Kanakuk families" (that is, families who sent their children to Kanakuk Kamps), including Doe's home, while they were out on "Kanakuk trail trips."  *Id.* ¶¶ 3.5, 4.36.  Newman always stayed with Kanakuk families during these trips if any were able to house him.  *Id.* ¶ 4.36.  These promotional trips were planned by the defendants and occurred during the part of the year when the camp was closed.  *Id.* ¶ 4.2.  The trips were designed to publicize and increase interest in the Kanakuk Kamps, and to "ultimately persuade

parents to enroll their children in Kanakuk Kamps." *Id.* ¶¶ 4.34, 4.36.  During these trips, Newman would molest the plaintiff in his home. *Id.* ¶ 3.5.  Doe also accompanied Newman on Kanakuk trail trips around Texas, during which Newman would molest him. *Id.* ¶¶ 3.7, 4.8.  This abuse took place from 2001 to 2007, from the time that the plaintiff was ten years old until he was sixteen years old. *Id.* ¶ 4.7.

B. <u>Procedural Background</u>

The plaintiff initially filed a complaint alleging several incidents of abuse and bringing claims sounding in negligence and fraud.  *See* Plaintiff's Original Complaint (docket entry 1).  The Kanakuk defendants moved for partial dismissal of that complaint on the grounds that (1) they were not liable under a theory of vicarious liability, (2) they owed no duty to the plaintiff when he was not a camper, and (3) the plaintiff failed to state a claim for fraud.  *See* Kanakuk Ministries and Kanakuk Heritage, Inc.'s Motion for Partial Dismissal (docket entry 13).  In response, Doe filed his first amended complaint, which alleged more detailed facts than his initial complaint.  *See generally* First Amended Complaint (docket entry 19).  The Kanakuk defendants then filed the instant motion for partial dismissal.  *See* Kanakuk Ministries and Kanakuk Heritage, Inc.'s Amended Motion for Partial Dismissal ("Amended Motion") (docket entry 24).  Doe filed a response, *see* Plaintiff's Response to Defendants Kanakuk Ministries' and Kanakuk Heritage's Amended Motion for Partial Dismissal (docket entry 29), and the defendants filed a

reply in support of their motion.  *See* Kanakuk Ministries and Kanakuk Heritage,

Inc.'s Reply Memorandum of Law in Support of Their Motion for Partial Dismissal

("Defendants' Reply") (docket entry 31).  The defendants' motion is now ripe for

decision.

## II. ANALYSIS

### A. Choice of Law

Neither party has fully addressed whether Texas or Missouri law should apply

to the substantive legal issues in this case.  Kanakuk stated that it had no preference

for either Texas or Missouri law because it felt that "there is no appreciable difference

in Texas or Missouri law for the matters raised" by its motion to dismiss.

Defendants' Brief at 3.  The plaintiff applied Texas law "[f]or the purpose of [its]

[r]esponse," but did "not concede that Texas is the proper choice of law."  Plaintiff's

Brief in Opposition to Defendant Kanakuk Ministries' and Kanakuk Heritage, Inc.'s

Amended Motion for Partial Dismissal ("Plaintiff's Response") at 9 n.6 (docket entry

30).  Because Missouri appears to apply a stricter standard than Texas for finding

vicarious liability, the court must determine which state's law applies to the plaintiff's

negligence-related claims before ruling on the defendants' motion to dismiss.[1]

---

[1]       It does not appear to the court that there is any practical difference
between Texas and Missouri law regarding the plaintiff's fraud-related claims, so the
court will not conduct a conflict-of-law analysis on that issue.  Compare *Trenholm v.
Ratcliff*, 646 S.W.2d 927, 930 (Tex. 1983) and *Renaissance Leasing, LLC v. Vermeer
Manufacturing Company*, 322 S.W.3d 112, 131-32 (Mo. 2010).

1.  *Legal Standard*

"A federal court must follow the choice-of-law rules of the state in which it sits." *St. Paul Mercury Insurance Company v. Lexington Insurance Company*, 78 F.3d 202, 205 (5th Cir. 1996).  Texas courts follow the Restatement (Second) of Conflict of Laws ("Restatement") and the "most significant relationship" test.  See *Duncan v. Cessna Aircraft Company*, 665 S.W.2d 414, 420-21 (Tex. 1984) (explaining that the Texas Supreme Court had "abandoned *lex loci delecti* and replaced it with the most significant relationship approach set forth in §§ 6 and 145 of the *Restatement (Second) of Conflict of Laws*").  Section 6(2) of the Restatement lists "factors relevant to the choice of the applicable rule of law" as follows:

> (a) the needs of the interstate and international systems,
>
> (b) the relevant policies of the forum,
>
> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
>
> (d) the protection of justified expectations,
>
> (e) the basic policies underlying the particular field of law,
>
> (f) certainty, predictability and uniformity of result, and
>
> (g) ease in the determination and application of the law to be applied.

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6(2); *Spence v. Glock, Ges.m.b.H*, 227

F.3d 308, 311-12 (5th Cir. 2000).  Section 145 of the Restatement lays out the

specific contacts that are to be considered in tort cases:

> (a) the place where the injury occurred,
>
> (b) the place where the conduct causing the injury
> occurred,
>
> (c) the domicil, residence, nationality, place of
> incorporation and place of business of the parties, and
>
> (d) the place where the relationship, if any, between the
> parties is centered.

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145(2); see also *Webb v. Rodgers*

*Machinery Manufacturing Company*, 750 F.2d 368, 374 (5th Cir. 1985) (applying the

Section 145 factors to determine which state's law to apply to a tort issue in Texas).

The Restatement further explains that in tort cases, "[t]he applicable law will usually

be the local law of the state where the injury occurred."  RESTATEMENT (SECOND) OF

CONFLICT OF LAWS § 156(2).  The Fifth Circuit has held that in applying these rules,

"[t]he court's analysis under the [Restatement] does not turn on the number of

contacts the event had with each jurisdiction, but, more importantly, on the

qualitative nature of those contacts as they are affected by the policies of the rule."

*Crim v. International Harvester Company*, 646 F.2d 161, 163 (5th Cir. 1981) (citing

*Gutierrez v. Collins*, 583 S.W.2d 312, 319 (Tex. 1979)); see also *Jackson v. West*

*Telemarketing Corporation Outbound*, 245 F.3d 518, 523 (5th Cir.) ("Although the

number of contacts is relevant, the qualitative nature of the contacts controls."), *cert. denied*, 534 U.S. 972 (2001).

The Fifth Circuit has provided further guidance for determining which state's law applies in cases where a resident of one state is injured in another state.  See *Guillory on Behalf of Guillory v. United States*, 699 F.2d 781 (5th Cir. 1983).  In *Guillory*, a Louisiana resident was harmed by the negligence of a hospital in Texas.  *Id.* at 783.  In determining whether to apply Texas or Louisiana law, the Fifth Circuit focused on "which state's law [would] most effectively advance the recognized policy interests of" the two states.  *Id.* at 785.  The court weighed the interest Texas had in "policing the conduct of its doctors" against the interest of Louisiana in "guaranteeing a just recovery for its citizens."  *Id.*  Ultimately, the court concluded that applying the law of Louisiana "most effectively promote[d] the needs of the interstate system," the policies of the two states, and the "underlying . . . field of tort law."  *Id.*  While the standard of liability would have been the same in either state, the standard of recovery would have varied significantly.  *Id.* at 786.  Because the residents of Louisiana would "bear the burden of the tortious conduct," they were "entitled to the opportunity to obtain the meaningful recovery provided for under Louisiana law."  *Id.* at 787.  This was especially true where there were no "countervailing circumstances requiring the application of Texas law."  *Id.*; see also *Blanchard v. Praxair, Inc.*, 951 F. Supp. 631, 634 (S.D. Tex. 1996) (finding that in cases where Texas residents are

harmed in other states, "Texas has a legitimate interest in ensuring that its citizens are adequately compensated for injuries they suffer and guaranteeing a just recovery").

2. *Application*

In this case, it would be more difficult for the plaintiff to prevail on his *respondeat superior* theory under Missouri law because Missouri uses a narrower definition of "scope of employment" for vicarious liability claims.  In Missouri, "[i]t is well-settled that the course and scope of employment test" looks to "whether [an employee's act] was done by virtue of [his] employment and in furtherance of the business or interest of the employer."  *Cluck v. Union Pacific Railroad Company*, 367 S.W.3d 25, 29 (Mo. 2012) (internal citations and quotation marks omitted), *cert. denied*, __ U.S. __, 133 S.Ct. 932 (2013).  This test is applied strictly to each act taken by an employee.  See *id.* at 33.

While more recent Texas cases state the Texas *respondeat superior* standard in a manner similar to the Missouri court in *Cluck*, there are also older cases that apply a broader standard.  Compare *Minyard Food Stores, Inc. v. Goodman*, 80 S.W.3d 573, 577 (Tex. 2002) ("The general rule is that an employer is liable for its employee's tort only when the tortious act falls within the scope of the employee's general authority in furtherance of the employer's business and for the accomplishment of the object for which the employee was hired."), with *GTE Southwest, Inc. v. Bruce*, 998 S.W.2d

605, 617-18 (Tex. 1999) (finding that a supervisor's inappropriate berating of his

employees fell within the scope of his authority, meaning that his employer was

vicariously liable for the harm he caused), and *Baker Hotel of Dallas, Inc. v. Rogers*, 157

S.W.2d 940, 943 (Tex. Civ. App.--Dallas 1941, writ ref'd w.o.m. per curiam)

(holding that even if an employee's acts are "ill-advised, malicious or wanton," an

employer can still be liable for those acts if the employer "set in motion the agency

that resulted in the wrong" and the wrongful acts "grew out of the exercise of an

authority which [the employer] had conferred upon [the employee]").

 Because Missouri's narrow interpretation would be more likely to preclude the

plaintiff from recovering under a theory of *respondeat superior*, the court concludes that

applying Texas law would best meet the relevant factors of the Restatement.  First, in

examining "the relevant policies of the forum state," *see* RESTATEMENT (SECOND) OF

CONFLICT OF LAWS § 6(2)(b), Texas has a strong interest in compensating its

residents for out-of-state injuries.  *Guillory*, 699 F.2d at 785; *Blanchard*, 951 F. Supp.

at 634.  Texas also has an interest in protecting the children of its state from being

preyed upon by outside corporations and their employees.  See *Bird v. W.C.W.*, 868

S.W.2d 767, 772 (Tex. 1994) ("The public has a strong interest in protecting

children, especially protecting them against physical and sexual abuse.").  Therefore,

the relevant policies of Texas, the forum state, weigh in favor of applying Texas law,

as it would give the plaintiff a better chance of obtaining redress for his injuries.

The court must weigh that interest against the "relevant policies" of Missouri and its "interests . . . in the determination of [this] particular issue." *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6(2)(c). The court recognizes that Missouri has an interest in having its legal standard applied to employers in its state. However, it is important that Texas law would apply a higher standard to Kanakuk in this case than would Missouri law, meaning that an application of Texas law would not undercut Missouri's ability to control its employers -- rather, it would supplement that control with a heightened standard for Missouri employers who operate outside of the state. In that way, applying Texas law would not allow employers to violate Missouri law, it would simply add to the requirements of Missouri law. The court therefore concludes that an application of Texas law would not compromise Missouri's interests in this case.

The court must also consider the importance of protecting "justified expectations." *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6(2)(d). It is true that a camp in Missouri may have an expectation that any potential liability it could face would be determined by Missouri law. However, when the defendants solicit children from outside the state and place employees in customers' homes outside the state, they should also expect that the laws of those states will apply to their conduct. For that same reason, "certainty, predictability, and uniformity of result" would not be harmed by the application of Texas law. *See* RESTATEMENT

(SECOND) OF CONFLICT OF LAWS § 6(2)(f).  Kanakuk may be held to a different

standard in this case than other Missouri employers generally are, but such a result

would not be improper, since it sought out-of-state business.

Lastly, a contacts inquiry under section 145 of the Restatement reveals that

the parties had basically equal contacts with Texas and Missouri.  Both the plaintiff's

home in Texas and the camp in Missouri constitute "place[s] where the injury

occurred."  *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145(a).  The

plaintiff is a resident of Texas, but Kanakuk is a resident of Missouri.  See *id.*

§ 145(c).  Furthermore, the parties' relationship began and continued in Texas, but

much of it also took place at the camp in Missouri, making both states "place[s]

where the conduct causing the injury occurred," as well as "place[s] where the

relationship . . . between the parties [was] centered."  See *id.* § 145(2)(b), (d).

Because the parties' contacts with both states were essentially equal, but the section

6(2) factors weigh in favor of applying Texas law, the court will apply Texas law.[2]

## B.  The Motion for Partial Dismissal

The defendants move to dismiss the plaintiff's complaint on four issues:

(1) that the defendants cannot be vicariously liable to the plaintiff because Newman

was acting outside the scope of his employment when he molested the plaintiff;

---

[2]       While it was not necessary to conduct a choice-of-law analysis on the
plaintiff's fraud-related claims, for the sake of uniformity, and because Texas has at
least as significant a relationship to this dispute as Missouri does, the court will also
apply Texas law to those claims.

(2) that the defendants owed no duty to the plaintiff when he was abused away from camp; (3) that the plaintiff's claim for fraud was not pled with particularity or with facts sufficient to support the elements of a fraud claim; and (4) that there was no injury to the plaintiff as a result of the alleged fraud by nondisclosure.  *See* Amended Motion at 1-2.

### 1.  *Rule 12(b)(6) Standard*

"To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'"  *In re Katrina Canal Breaches Litigation*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 570 (2007)), *cert. denied*, 552 U.S. 1182 (2008).  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555 (citations, quotation marks, and brackets omitted).  "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *In re Katrina Canal*, 495 F.3d at 205 (quoting *Twombly*, 550 U.S. at 555) (internal quotation marks omitted).  "The court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff."  *Id.*  (quoting *Martin K. Eby Construction Company, Inc.*

*v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)) (internal quotation marks omitted).

The Supreme Court has prescribed a "two-pronged approach" to determine whether a complaint fails to state a claim under Rule 12(b)(6).  See *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).  The court must "begin by identifying the pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth."  *Id.* at 679.  The court should then assume the veracity of any well-pleaded allegations and "determine whether they plausibly give rise to an entitlement of relief."  *Id.*  The plausibility principle does not convert the Rule 8(a)(2) notice pleading to a "probability requirement," but "a sheer possibility that a defendant has acted unlawfully" will not defeat a motion to dismiss.  *Id.* at 678.  The plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged -- but it has not 'show[n]' -- 'that the pleader is entitled to relief.'"  *Id.* at 679 (alteration in original) (*quoting* FED. R. CIV. P. 8(a)(2)).  The court, drawing on its judicial experience and common sense, must undertake the "context-specific task" of determining whether the plaintiff's allegations "nudge" his claims against the defendants "across the line from conceivable to plausible."  See *id.* at 679, 683.

2.  *Doe's Respondeat Superior Claim*

The plaintiff claims that Kanakuk is liable for Newman's sexual abuse under theories of "vicarious liability, *respondeat superior*, agency, apparent agency, and agency by estoppel," as well as for being "negligent in hiring, supervising, retaining, and/or continuing [Newman's] employment."  Amended Complaint ¶¶ 4.44, 5.30.  The defendants have moved to dismiss the plaintiff's *respondeat superior* theory of liability. Defendants' Brief at 4-6.  The defendants contend that they are not liable under this theory because the sexual molestation of the plaintiff was not within the scope of Newman's employment nor within the camp counselor job description.  *Id.* at 5-6; Defendants' Reply at 1.

a.  Legal Standard

Under Texas law, "[g]enerally, there is no duty to control the conduct of third persons."  *Greater Houston Transportation Company v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990).  One exception to that rule is "where there exists a special relationship between the defendant and the injured party or between the defendant and the third person."  *Doe v. Boys Club of Greater Dallas, Inc.*, 868 S.W.2d 942, 949 (Tex. App.-- Amarillo 1994), *aff'd*, 907 S.W.2d 472 (Tex. 1995).  In cases involving employer- employee relationships, there are two general theories available under this special relationship exception: direct liability under a theory of negligent hiring or supervision, and vicarious liability under a theory of *respondeat superior*.  See *id.* at 950.

Under the *respondeat superior* theory of liability, an employer can be held vicariously liable for an employee's tortious act if that act (1) "falls within the scope of the employee's general authority" and was (2) committed "in furtherance of the employer's business" (3) "for the accomplishment of the object for which the employee was hired." *Minyard Food Stores*, 80 S.W.3d at 577. "[I]f an employee deviates from the performance of his duties for his own purposes, the employer is not responsible for what occurs during that deviation." *Id.* Along these lines, the Fifth Circuit has observed that "[i]t would be hard to imagine a more difficult argument than that [an employee's] illicit sexual pursuits were somehow related to his duties . . . or that they in any way furthered the interests of . . . his employer." *Tichenor v. Roman Catholic Church of Archdiocese of New Orleans*, 32 F.3d 953, 960 (5th Cir. 1994) (applying Mississippi law, which is similar to Texas vicarious liability law).[3]

### b. Application

The defendants object that sexually abusing the plaintiff was not in the "course and scope" of Newman's employment, as they did not "hire[] Newman to abuse children." *See* Defendants' Reply at 1. The plaintiff contends that much of the abuse

---

[3]     In arguing for its version of *respondeat superior* law, the plaintiff places a great deal of weight on one quotation, even bolding it within his brief, from *Texas & P. Ry. Co. v. Hagenloh*, 247 S.W.2d 236 (Tex. 1952). *See* Plaintiff's Response at 19-20 (quoting *Hagenloh*, 247 S.W.2d at 443-44). However, that quotation is from the dissent, citing an old treatise. See *Hagenloh*, 247 S.W.2d at 243-44 (Smith, J., dissenting). It therefore holds no precedential authority, and does not represent the current Texas rule.

suffered by the plaintiff took place while Newman was performing his assigned job duties.  *See* Plaintiff's Response at 18-20.  For instance, Newman acted inappropriately during "Bible study," basketball, swimming, and other camp activities.  *See* Amended Complaint ¶¶ 4.14, 4.17, 4.29.

While the court finds the defendants' contention that they never "hired Newman to abuse children" irrelevant, it must nonetheless agree that the plaintiff cannot show that Newman was acting "in furtherance of" Kanakuk's business when he molested Doe.  Basketball and Bible study may have been authorized by Kanakuk and performed in furtherance of its business and "for the accomplishment of the object for which" Kanakuk hired Newman, but once Newman made sexual advances on Doe he had "deviate[d] from the performance of his duties for his own purposes," so Kanakuk was "not responsible for what occur[ed] during that deviation."  See *Minyard Food Stores*, 80 S.W.3d at 577.  Similarly, even though Kanakuk sent Newman to stay in the plaintiff's home for marketing purposes, *see* Amended Complaint ¶¶ 3.5, 4.36, 4.41, it was not vicariously liable for him molesting Doe because that was not done "in furtherance of" Kanakuk's business.  Therefore, the defendants' motion to dismiss the plaintiff's *respondeat superior* theory of liability is granted.[4]

---

[4]     Note that this holding has no impact on the defendants' potential *direct* liability under the plaintiff's claims for negligent hiring and negligent supervision.  *See* Amended Complaint ¶ 5.30.

c.  Ratification

In addition to alleging that Kanakuk was vicariously liable for Newman's acts

under a theory of *respondeat superior*, Doe claims that Kanakuk ratified Newman's

tortious conduct.  *See* Amended Complaint ¶ 4.50.  The defendants' motion to

dismiss does not address the plaintiff's ratification theory.  However, in response to

Kanakuk's motion to dismiss Doe's *respondeat superior* theory, Doe appears to confuse

*respondeat superior* with ratification and raises a number of ratification arguments, *see*

Plaintiff's Response at 20-21, to which the defendants respond in their reply.  *See*

Defendants' Reply at 4.  Strictly speaking, ratification is a direct, not vicarious,

theory of liability.  By ratifying an employee's conduct, an employer becomes directly

liable for his acts, as opposed to being vicariously liable for those acts simply by

nature of being the employee's employer.  See *Phillips v. Wells Fargo Bank*, No.

08-CV-4686 PJS/FLN, 2009 WL 2366554, at *2 (D. Minn. July 30, 2009)

(explaining the difference between vicarious liability and ratification); RESTATEMENT

(SECOND) OF AGENCY § 82 ("Ratification is the affirmance by a person of a prior act

which did not bind him but which was done or professedly done on his account,

whereby the act, as to some or all persons, is given effect as if originally authorized by

him.").  Because the defendants only moved to dismiss the plaintiff's *respondeat*

*superior* theory of liability, the court need not address the plaintiff's ratification claim

at this time.

### 3. *Kanakuk's Duty of Care When the Plaintiff Was Not a Camper*

The defendants seek to dismiss the plaintiff's negligence claim as it relates to incidents that occurred in the plaintiff's home and while he was on trips with Newman because, they claim, "no duty can be owed to Plaintiff when he was not a camper." *See* Defendants' Brief at 6. The defendants argue that under Texas law, a third party does not owe a duty of care to a child when the child's parents are present. See *id.* (citing *McCullough v. Godwin*, 214 S.W.3d 793, 806 (Tex. App.--Tyler 2007, no pet.)).

In *McCullough*, a mother of a deceased boy sued her ex-husband, who was the boy's father, and two of the ex-husband's adult friends who were present when the boy drowned. *McCullough*, 214 S.W.3d at 798-99. The court found that the mother could not bring a claim against the ex-husband's friends because, while they had brought the boy to the place where he drowned, the father had taken responsibility for him at that time and had removed his life jacket. *Id.* at 807. The court held that even though the friends were aware of "the inherent risks of boating and the warnings imprinted on the inner tube" in which the boy became entangled and drowned, "a reasonable person under these circumstances would not foresee that a child, whose parent was present and had a duty of care with regard to that child, would drown while playing on an inner tube floating in approximately three feet of water." *Id.* at 808.

The *McCullough* holding does not support the defendants' argument that when a child is with a parent, the parent has "the sole duty to supervise" the child and no other party owes a duty of care to the child. *See* Defendants' Brief at 1. Rather, *McCullough* simply stands for the proposition that when a child is in the presence of several adults, including the child's parent, the parent is generally responsible for accidents that befall the child. That holding does not modify the general rule that employers owe a duty to the public to responsibly hire and supervise their employees. See *Boys Club of Greater Dallas*, 868 S.W.2d at 950. To conclude that this duty ceases to exist when a child's parent is present -- that, for instance, an employer could hire a violent ex-convict to work as a grocery store clerk without conducting an inquiry into his temperament or subsequently monitoring his aggressive behavior at work, and have no potential liability when that employee foreseeably harmed a child who happened to be shopping with a parent -- would be quite absurd.

Furthermore, the fact that the plaintiff was in his own home for some of the abuse does not affect the defendants' liability for their employee's conduct. In a situation similar to that presented by this case, the Texas Supreme Court held that a vacuum cleaner company was liable when one of its salesman sexually assaulted a customer in her home. *Read v. Scott Fetzer Company*, 990 S.W.2d 732, 735 (Tex. 1998). In *Read*, the court found that the company was "negligent through its own conduct of creating an in-home marketing system without adequate safeguards to

eliminate dangerous salespersons from its sales force." *Id.*  The court reasoned that by requiring the salesman to market the vacuums "only through in-home demonstration," the company retained control over his behavior and was required to "exercise this retained control reasonably." *Id.*

The plaintiff alleges that when he was with Newman outside of camp, Newman was still acting as an employee of Kanakuk.  Like the vacuum cleaner salesman in *Read*, Newman was at the plaintiff's home for work purposes.  *See* Amended Complaint ¶¶ 3.5, 4.36.  Newman was only ever allowed entry into the plaintiff's home at the behest of the defendants, since part of the "Kanakuk trail" involved placing their employees into the homes of "kampers."  *Id.* ¶¶ 4.1, 4.36, 4.41. Furthermore, the father-son retreat and the Kanakuk promotional trips on which Doe accompanied Newman were official Kanakuk events, during which Newman was functioning as a Kanakuk employee.  *Id.* ¶¶ 3.7, 4.34, 4.42, 4.43.  Therefore, Kanakuk was responsible for Newman at those times and could be liable for the harm he caused, regardless of the presence of Doe's parents in Doe's home, or the fact that Doe and Newman were not actually on camp premises.  The defendants' motion to dismiss the plaintiff's claims relating to liability for harm caused by Newman away from the camp is thus denied.

4. *Doe's Fraud Claim*

The defendants contend that the plaintiff did not plead his claim for fraud with enough particularity to satisfy the heightened pleading standards of Federal Rule of Civil Procedure 9(b), and that the allegations do not satisfy the elements for a fraud claim under Texas law. *See* Defendants' Brief at 7-9.

a. Legal Standard

Under Rule 9(b), a plaintiff "must state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b). It is important to note that "[w]hat constitutes 'particularity' will necessarily differ with the facts of each case." *Guidry v. Bank of LaPlace*, 954 F.2d 278, 288 (5th Cir. 1992). At a minimum, "[p]leading fraud with particularity in [the Fifth] [C]ircuit requires 'time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what [that person] obtained thereby.'" *Williams v. WMX Technologies, Inc.*, 112 F.3d 175, 177 (5th Cir.)) (quoting *Tuchman v. DSC Communications Corporation*, 14 F.3d 1061, 1068 (5th Cir. 1994)), *cert. denied*, 522 U.S. 966 (1997). "Put simply, Rule 9(b) requires 'the who, what, when, where, and how' to be laid out." *Benchmark Electronics, Inc. v. J.M. Huber Corporation*, 343 F.3d 719, 724 (5th Cir. 2003) (quoting *Williams*, 112 F.3d at 179).

In *Benchmark Electrics*, the Fifth Circuit held that a complaint satisfied Rule 9(b) where it alleged that "a Huber representative made false representations . . . in April

- 23 -

1999 in Angleton, Texas." *Benchmark Electrics*, 343 F.3d at 724. The complaint had

also alleged that Huber had made "false or misleading" statements during meetings,

in a memorandum, and "in personal discussions between Huber representatives and

Benchmark in June, July, and August 1999," and the complaint named several

specific Huber employees who had made misleading statements. *Id*. The court

pointed out that the complaint also stated "why the various assertions [were]

fraudulent or misleading." *Id.* In *Williams*, on the other hand, the court dismissed

one of the plaintiffs' fraud claims because the plaintiffs only alleged that a certain

individual had made material misrepresentations, but did not specify "a place or time

that these representations were made." *Williams*, 112 F.3d at 178. The court also

dismissed another of the plaintiffs' fraud claims due to their "failure . . . to identify

specific statements made by any of the defendants." *Id.* at 179.

In addition to satisfying the Rule 9(b) pleading standard, a plaintiff must

properly allege the elements of a fraud claim. To state a cause of action for fraud

under Texas law, the plaintiff must allege facts sufficient to show that: (1) the

defendants "made a material representation that was false"; (2) they "knew the

representation was false or made it recklessly as a positive assertion without any

knowledge of its truth"; (3) they "intended to induce the plaintiff to act upon the

representation"; and (4) the plaintiff "actually and justifiably relied upon the

- 24 -

representation and thereby suffered injury." *Ernst & Young, L.L.P. v. Pacific Mutual Life Insurance Company*, 51 S.W.3d 573, 577 (Tex. 2001).

Furthermore, to constitute a material representation, the allegedly fraudulent statement at issue must be one of fact, rather than of opinion.  See *Italian Cowboy Partners, Limited v. Prudential Insurance Company of America*, 341 S.W.3d 323, 337-38 (Tex. 2011).  The Texas Supreme Court has held that "'[w]hether a statement is an actionable statement of "fact" or merely one of "opinion" often depends on the circumstances in which a statement is made.'"  *Id.* at 338 (quoting *Transport Insurance Company v. Faircloth*, 898 S.W.2d 269, 276 (Tex. 1995)).  "Special or one-sided knowledge may help lead to the conclusion that the misrepresentation was one of fact, not opinion."  *Id.*  Indeed, Texas courts have found that an exception to the opinion rule "exists when the person giving the opinion has knowledge superior to that of the person relying upon the opinion, as, for example, when the facts underlying the opinion are not equally available to both parties."  *McCollum v. P/S Investments, Limited*, 764 S.W.2d 252, 254 (Tex. App.--Dallas 1988, writ denied); see also *Greenlee Enterprises, Inc. v. Compass Bank, N.A.*, No. 05-10-00490-CV, 2011 WL 6209192, at *8 (Tex. App.--Dallas Dec. 5, 2011, no pet.) (applying the superior knowledge exception discussed in *McCollum*).

b.  Application

The defendants argue that the plaintiff did not make sufficiently specific allegations concerning the time, place, and contents of Kanakuk's alleged misrepresentations, as well as the identity of the person making those misrepresentations.  *See* Defendants' Brief at 7-9.  While the defendants may be correct that some of the plaintiff's individual allegations might be too indefinite to satisfy Rule 9(b) by themselves, the court concludes that the allegations as a whole are specific enough to survive a motion to dismiss.

Doe alleges that Kanakuk made a number of fraudulent misrepresentations through informational sessions, promotional videos and brochures, its website, and during closing ceremonies at the end of each camp session.  *See* Amended Complaint ¶¶ 3.2, 4.47, 5.4.  These representations consisted of referring to their camp as "a wholesome environment, adhering to strict Christian values, including sexual purity." *Id.* ¶ 5.5.  Kanakuk also presented a personal testimonial from its president, Joe White, who stated that "Pete Newman is the most thorough relationship builder with kids in Kanakuk history.  This guy has a raging love for God and it spills over constantly to the kids at kamp.  A weekend with Pete will build a father-son relationship that will never be the same." *Id.* ¶ 4.47.  The plaintiff alleges that these misrepresentations were made during the period that he was a camper, from the time that he was seven years old until he was sixteen. *Id.* ¶ 4.1.  Doe also specifically

alleges that the misrepresentations took place during the years that he was molested, which occurred in 2001 through 2007.  *Id.* ¶ 4.7.

Furthermore, the plaintiff explains why those statements were false.  He alleges that Kanakuk knew that Newman was in fact not cultivating a "wholesome environment" of sexual purity in light of the numerous incidents of inappropriate nude behavior and sleeping with boys.  Amended Complaint ¶¶ 4.14, 4.16, 5.12.  The defendants misrepresented that fact to solicit and recruit minor campers like the plaintiff to attend camp at Kanakuk.  *Id.* ¶ 5.2.  By relying on these misrepresentations, the plaintiff alleges, he suffered from "tremendous long-term injury."  *Id.* ¶¶ 5.15-5.16.  The plaintiff has thus stated his fraud claim with sufficient particularity to satisfy Rule 9(b).

The defendants also argue that the alleged misrepresentations were only opinions.  *See* Defendants' Brief at 8.  The plaintiff alleges that the defendants had substantial special knowledge about Newman's unlawful sexual acts, *see* Amended Complaint ¶¶ 4.16, 4.22, 4.23, but continued to feature him as "the face" of Kanakuk and promote him as "the most thorough relationship builder with kids."  See *id.* ¶¶ 4.46-4.47.  Because Kanakuk had special knowledge of Newman's prior sexually abusive behavior, the court concludes that the statements it made about him and the "wholesome environment" of the camp were not merely opinions -- they were factual misrepresentations.  See *Italian Cowboy Partners*, 341 S.W.3d at 338.  It could

hardly be considered a matter of opinion that promoting a camp that employs a known -- or, at the very least, highly suspected -- pedophile as a "wholesome environment" was misleading.

Next, the Kanakuk defendants argue that the plaintiff never alleged that the defendants knew that any of the statements they made about Newman were false. *See* Defendants' Brief at 8.  Again, when the facts in the complaint are taken as true, the Kanakuk defendants had sufficient knowledge of Newman's inappropriate conduct with campers to make their statements that the camp was safe for children knowingly false.  *See* Amended Complaint ¶¶ 4.6, 5.12-5.13.  The defendants promoted their camp as a safe Christian place for children while they simultaneously continued the employment of -- and even promoted -- a camp director who they knew had acted inappropriately with children.  *Id.* ¶¶ 4.6, 4.9, 4.12, 4.22, 4.24.

Lastly, the defendants contend that the plaintiff's complaint only alleges that Doe's parents relied on alleged misrepresentations, but not that Doe himself did.  *See* Defendants' Brief at 9; Defendants' Reply at 8.  However, the complaint does allege that John Doe III "would not have continued as a camper at Kanakuk" had he known about Newman's misconduct with other campers.  Amended Complaint ¶ 4.42. Thus, the plaintiff has alleged that he relied on Kanakuk's alleged misrepresentations.

For the above reasons, the court concludes that the plaintiff has pled, with the necessary particularity, facts sufficient to state a claim for fraud under Texas law. Therefore, the defendants' motion to dismiss his fraud claim is denied.

### 5.  *Doe's Fraud by Non-Disclosure Claim*

Lastly, the defendants move to dismiss the plaintiff's claim for fraud by non-disclosure.  *See* Defendants' Brief at 9-10.  Before a claim for fraud by non-disclosure can arise, a defendant must have a duty to disclose certain facts.  See *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 341 (5th Cir. 2008); *Ralston Purina Company v. McKendrick*, 850 S.W.2d 629, 633 (Tex. App.--San Antonio 1993, writ denied). "This is entirely a question of law, to be decided by reference to statutory and case law." *Ralston Purina Company*, 850 S.W.2d at 633.  Under Texas law, a duty to disclose may arise in the following situations:  "(1) when there is a fiduciary relationship; (2) when one voluntarily discloses information, the whole truth must be disclosed; (3) when one makes a representation, new information must be disclosed when that new information makes the earlier representation misleading or untrue; and (4) when one makes a partial disclosure and conveys a false impression." *Hoggett v. Brown*, 971 S.W.2d 472, 487 (Tex. App.--Houston [14th Dist.] 1997, pet. denied). A duty to disclose also arises "when one party knows that the other party is ignorant of the true facts and does not have an equal opportunity to discover the truth."

- 29 -

*Miller v. Kennedy & Minshew*, 142 S.W.3d 325, 345 (Tex. App.--Fort Worth 2003, pet. denied).

Doe argues that the defendants had a duty to disclose their special knowledge of Newman's past inappropriate behavior with young boys. *See* Amended Complaint ¶¶ 4.23, 5.18. The defendants respond that they did not have any special knowledge required to create a cause of action for fraud by non-disclosure, and that even if they did, the failure to disclose that particular information did not harm the plaintiff. *See* Defendants' Brief at 9-10. They focus on their knowledge of Newman's nudity with children other than Doe, and insist that "Plaintiff was not injured by Newman's nudity with other individuals, he was injured by Newman's sexual abuse of himself." *Id.* at 9-10. They further argue that "Plaintiff's argument of nondisclosure seemingly rests on his assertion that Kanakuk Defendants owed a generic duty to inform him of things that were 'wrong' and 'hurtful to children,'" and that "if anyone owed such a duty to Plaintiff, it was his own parents who had a statutory and constitutional obligation to protect and manage their child." *Id.* at 10.

This is a strained and disingenuous argument. The plaintiff does not suggest that Kanakuk should have warned campers of everything that could be "hurtful to children" -- simply that Kanakuk should have warned people about Newman's history of sexual abuse. Doe has alleged not only that Newman engaged in several incidents of inappropriate behavior -- including riding four-wheelers, swimming, and playing

basketball in the nude with young boys -- but that Kanakuk knew about that behavior.  *Id.* ¶¶ 4.14, 4.16, 4.18, 4.34.  It is not unreasonable to expect that if a camp knew that one of its counselors had engaged in repeated nude contact with young boys, it would disclose that information to potential campers.  Nor is it unreasonable to argue that the failure to disclose that information led to Doe and his parents being comfortable sending Doe to Kamp Kanakuk, where he was repeatedly molested and subjected to inappropriate nude contact with Newman.  *See* Plaintiff's Response at 25; Amended Complaint ¶¶ 5.20, 5.26.  Therefore, the plaintiff's allegations -- taken as true -- establish that the defendants had special knowledge about Newman's misconduct, which created a duty to disclose.  Because Doe has also alleged that the defendants did not disclose their special knowledge about Newman, he has stated a valid claim for fraud by non-disclosure.  The defendants' motion to dismiss that claim is denied.

## III.  CONCLUSION

For the reasons stated above, the defendants' motion for partial dismissal is **GRANTED** as to the plaintiff's *respondeat superior* theory of liability but **DENIED** as to all other theories and claims.

**SO ORDERED**.

July 24, 2014.

_A. Joe Fish_
_____
A. JOE FISH
**Senior United States District Judge**